UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ALFRED E. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-00855-JRS-MPB |
| | ) | |
| COMMUNITY HOSPITAL | ) | |
| ANDERSON/MADISON COUNTY | ) | |
| a/k/a COMMUNITY HEALTH | ) | |
| NETWORK, | ) | |
| COMMUNITY HOSPITAL POLICE | ) | |
| DEPARTMENT, | ) | |
| JASON THOMAS Officer, | ) | |
| PHILLIP ALLEN Officer, | ) | |
| MADISON COUNTY SHERIFF'S DEPT., | ) | |
| TWO UNKNOWN MADISON COUNTY | ) | |
| SHERIFF DEPUTIES, | ) | |
| MADISON COUNTY, | ) | |
| SHAWN DOE, | ) | |
| SCOTT C. MELLINGER, | ) | |
| JOHN DOE, | ) | |
| RICHARD ROE, | ) | |
| CURTIS ROE, | ) | |
| COMMUNITY HEALTH NETWORK, | ) | |
| BRIAN MILLS, | ) | |
| BONNIE CORBREY, | ) | |
| BETH THARP, | ) | |
| ADAM RAMER, DEPUTY SHERIFF, | ) | |
| CHRISTOPHER E MILLER, MD, | ) | |
| | ) | |
| Defendants. | ) | |

**Entry on Motions for Summary Judgment**

Alfred E. Johnson suffered a mental disturbance while in the lobby of the Madison

County Jail where he was permitted to be to stay warm.  Events occurred that caused

Madison County Sheriff's Deputies to transport Johnson to Community Hospital of

Anderson in Madison County to obtain a mental health evaluation. And events transpired at the hospital that led to Johnson's arrest and detention for battery on a police officer and resisting law enforcement. Johnson brings this action under 42 U.S.C. § 1983 against persons and entities with whom he allegedly had contact that night. Defendants have moved for summary judgment. Johnson opposes their motions.

## I. Legal Standards

### A. *Summary Judgment*

Summary judgment is appropriate when there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. *FKFJ, Inc. v. Village of Worth*, 11 F. 4th 574, 584 (7th Cir. 2021). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of fact is "material" if the fact "might affect the outcome of the suit under the governing law." *FKFJ, Inc.*, 11 F.4th at 584 (quoting *Anderson*, 477 U.S. at 248). Hence, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (quoting *Anderson*, 477 U.S. at 247–48).

All reasonable inferences are drawn in favor of the non-moving party. *FKFJ, Inc.*, 11 F.4th at 585 (quotation omitted). However, mere speculation, conjecture, and conclusory allegations are insufficient to overcome a properly supported summary

judgment motion. *Id.* "When the non-moving party fails to establish 'the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' Rule 56(c) mandates entry of summary judgment against that party because 'a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## B. *Section 1983 Liability*

To state a claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).  Section 1983 actions can only be brought against persons acting under the color of state law.  *West*, 487 U.S. at 48.

## II. Madison County Defendants' Motion for Summary Judgment

### A. *Events at the Jail*

On February 24, 2020, Alfred Johnson entered the lobby of the Madison County Jail. (Adam Ramer Aff. ¶ 5, ECF No. 106-1.)  The lobby is a "safe space" and generally open to the public.  (*Id.* ¶ 6.)  At approximately 1:07 a.m. on February 25, 2020, Deputy Adam Ramer, a Sheriff Deputy with the Madison County Sheriff's Department (the "Sheriff's Department"), was dispatched to the jail lobby.  (*Id.* ¶ 5.) Johnson had reported to the 911 dispatcher that Johnson's phone "had murder on it"

and his uncle "killed" his girlfriend.  (*Id.* ¶ 7.)  Deputy Ramer met with Johnson, who was scared and appeared to be delusional.[1]  (*Id.* ¶ 78.)  Johnson said that people were trying to kill him.  (*Id.* ¶ 9.)  He also stated that he did not feel safe and wanted to go to the Anderson Police Department so police officers could "do something about the person in his phone."  (*Id.* ¶ 10.)  Yet Johnson also said that he wanted to stay at the jail to stay safe.  (*Id.*)  Ramer believed that Johnson displayed disorganized thoughts and an inconsistent temperament.[2]  (*Id.* ¶ 9.)  Deputy Ramer left Johnson in the lobby and continued his patrol.  (*Id.* ¶ 11.)

Soon Ramer was dispatched to the jail again.  The dispatcher advised Ramer that a suspicious person had barricaded himself in the bathroom and was screaming that someone in the Sheriff's Department was going to kill him.[3]  (Ramer Aff. ¶ 12, ECF No. 106-1.)  The dispatcher informed Ramer that the person was making multiple 911 calls and hanging up.  (*Id.*)  When Ramer got to the lobby, he found the bathroom door shut and locked.  (*Id.* ¶ 13.)  He confirmed Johnson was in the bathroom and

---

[1] Johnson states in an affidavit that while in the jail lobby on *February 24*, he "did not demonstrate increasingly delusional, erratic, or paranoid behavior."  (Johnson Aff. ¶ 1 (emphasis added), ECF No. 124-1.)  This does not create an issue of fact as to whether he acted in this manner in the early hours of *February 25*.

[2] Johnson denies displaying "disorganized thoughts or an inconsistent temperament," (Johnson Aff. ¶ 7, ECF No. 124-1), but he offers nothing to show he had personal knowledge of Ramer's beliefs.

[3] While Johnson disputes that he had barricaded himself in the bathroom, (Johnson Aff. ¶ 2, ECF No. 124-1), he does not refute Ramer's statement that the 911 dispatcher had advised Ramer that someone had barricaded themselves in the bathroom.  Nor does Johnson dispute that he had locked himself in the bathroom or that the bathroom door was locked when the deputies tried to open it.  Rather, he agrees that the deputies unlocked the door and found him inside.  (Johnson Aff. ¶¶ 10–11, ECF No. 124-1.)

asked him to exit the bathroom voluntarily.[4]   (*Id.*)   By then, two other sheriff's deputies, Sergeant Greg Adams and Captain Adam Stephenson, had arrived to assist Ramer.  (*Id.* ¶ 14.)  Adams and Stephenson were Deputy Ramer's superiors and supervised his activities.  (*Id.* ¶ 15.)

Johnson did not leave the bathroom.  (*Id.* ¶ 16.)  The deputies unlocked the bathroom door, finding Johnson inside.  (*Id.* ¶¶ 17, 18.)  Johnson was searched for weapons and placed in handcuffs.  He complained that the handcuffs were too tight. (Johnson Aff. ¶ 13, ECF No. 124-1.)  The deputies removed Johnson from the bathroom and tried to calm him down, but he did not calm down.  (Ramer Aff. ¶¶ 19–20, ECF No. 106-1.)

Based on his experience as a mental health therapist and his training on how to evaluate and respond to members of the public who appear to be suffering from mental illness, (Ramer Aff. ¶¶ 3, 4, 21, ECF No. 106-1), Deputy Ramer believed Johnson to be in a state of psychosis because of his paranoia, possible hallucinations, frantic and erratic behavior, and inability to exercise sound judgment,[5] (*id.* ¶ 21). Johnson's statements that people were going to kill or harm him gave Deputy Ramer a concern that Johnson may resort to violence if he perceived he was being threatened

---

[4] Johnson disputes that he refused to exit the bathroom, (Johnson Aff. ¶ 8, ECF No. 124-1), but does not dispute that Ramer asked Johnson to exit the bathroom or that Johnson did not leave the bathroom on his own before the deputies unlocked the door to gain entry and removed him.

[5] Johnson states that Ramer did not reasonably believe Johnson was in a state of psychosis, (Johnson Aff. ¶¶ 15, 22, ECF No. 124-1), but Johnson offers no basis for personal knowledge of what Ramer may have believed based on information he had received from the 911 dispatcher and Ramer's own observations of Johnson.

with physical harm.  (*Id.* ¶ 22.)  Ramer believed Johnson was a danger to himself and others.[6]  (*Id.* ¶ 23.)

Deputy Ramer completed an Immediate Detention form for Johnson's transport, reporting concerns about Johnson's conduct and his statements to dispatchers and officers.  (Ramer Aff. ¶ 23, ECF No. 106-1.)  Ramer and two other sheriff's deputies transported Johnson in a sheriff's vehicle to Community Hospital of Anderson/Madison County ("CHA" or the "Hospital").  (*Id.* ¶ 26.)  Johnson remained handcuffed for his and the officers' safety.  (*Id.*)  Upon arrival at the Hospital, Deputy Ramer removed Johnson's handcuffs and transferred him to the custody of the Community Hospital Police Department ("CHA-PD").[7]  (*Id.* ¶ 27.)  Thereafter, Deputy Ramer left and had no further interaction with Johnson.  (*Id.* ¶ 29.)

Deputy Ramer physically touched Johnson when Ramer entered the bathroom, checked Johnson for weapons, and applied handcuffs to him.  (Ramer Aff. ¶ 30, ECF No. 106-1.)  Ramer also physically touched Johnson when he led Johnson out of the jail lobby, transported him to CHA, delivered him to the custody of the Hospital police, and removed his handcuffs.  (*Id.*)  Ramer used only the slightest amount of force to secure Johnson in handcuffs and escort him.  (*Id.* ¶ 31.)  No other force was

---

[6] Johnson states that Ramer did not reasonably believe that Johnson posed a danger to himself or others, (Johnson Aff. ¶ 3, ECF No. 124-1), but offers no basis for personal knowledge of Ramer's beliefs.  The undisputed facts suggest such a belief was reasonable.

[7] Johnson's conclusory statement that the use of mechanical restraints on him during his transport to the Hospital was not due to any safety concerns, (Johnson Aff. ¶ 19, ECF No. 124-1), is insufficient to raise a genuine issue of material fact.  *FKFJ, Inc. v. Village of Worth*, 11 F. 4th 574, 585 (7th Cir. 2021) (mere speculation, conjecture, and conclusory allegations are insufficient to overcome a properly supported summary judgment motion).

necessary because Johnson was compliant after being secured in handcuffs. (*Id.*)

At all times relevant, Scott Mellinger was the elected Sheriff of Madison County. (Scott Mellinger Aff. ¶ 2, ECF No. 106-3.) In the early morning of February 25, 2020, Sheriff Mellinger had no personal interaction with Johnson, and the Sheriff did not give any instructions to any member of the Sheriff's Department related to Johnson. (*Id.* ¶¶ 4–5.) Sheriff Mellinger was not physically present at the Sheriff's Department then either. (*Id.* ¶ 6.) The Sheriff's Department has no policy or practice that directs or permits the use of mechanical restraints on non-dangerous and/or non-mentally-ill individuals. (Mellinger Aff. ¶ 7, ECF No. 106-3.) The Sheriff's Department follows state and constitutional guidance with respect to restraining, detaining, and transporting individuals for mental health purposes. (*Id.* ¶ 8.)

### B. Discussion

Johnson alleges that Deputy Ramer unlawfully seized and detained him in violation of Johnson's constitutional rights. Johnson also alleges that the Sheriff's Department implemented or failed to implement a policy related to the seizure, arrest, detention, and restraint of individuals suspected to have mental illness and failed to adequately train its officers. Johnson has sued both Sheriff Mellinger and Deputy Ramer in their official and individual capacities. In his response brief, Johnson argues an unreasonable-search claim, but his Amended Complaint fails to allege a claim against Deputy Ramer based on an unconstitutional search.

The Madison County Defendants argue that Johnson's temporary detention was permissible under Indiana and constitutional law and that the slight force used by

Deputy Ramer to handcuff and escort Johnson was objectively reasonable under the circumstances.   Defendants also contend that the Sheriff's Department is not a suable entity and that the *Monell* claim, *see Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658 (1978), fails because Johnson has no evidence of any policy, practice, or custom that caused his alleged damages.   Furthermore, Defendants argue that Sheriff Mellinger was not personally involved in the events involving Johnson and cannot be liable for any alleged constitutional violation.

### 1.   The Madison County Sheriff's Department

The Court begins with the Madison County Sheriff's Department.   In Indiana, municipal departments "are not suable entities."  *See Sow v. Fortville Police Dep't,* 636 F.3d 293, 300 (7th Cir. 2011) (police departments not suable entities).   And the Sheriff's Department is not a "person" subject to suit under § 1983.  *Lamb v. Harrison Cnty. Sheriff Dep't*, No. 4:17-cv-0148-SEB-DML, 2017 WL 3605284, at *3 (S.D. Ind. Aug. 22, 2017).   Therefore, the claims against the Madison County Sheriff's Department are **dismissed**.

### 2.   Sheriff Scott Mellinger

As for Sheriff Mellinger, the Court first addresses the individual capacity claims. A person cannot be held liable under § 1983 under a theory of respondeat superior; rather, to be held individually liable, a person must have had some personal responsibility for the constitutional deprivation.  *See Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002).  The undisputed evidence is that the Sheriff had no personal interaction with Johnson and gave no instructions to any member of the Sheriff's

Department related to Johnson.   (Sheriff Mellinger Aff. ¶¶ 4–5, ECF No. 106-3.)
Therefore, the Sheriff cannot be held individually liable under § 1983 for any
constitutional deprivation.

Turning to the official capacity claims, such claims are treated as claims against
the corporate entity for which each individual works, here, Madison County. *See, e.g.*,
*Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).  "[A] governmental entity is liable
under § 1983 only when the entity itself is a "'moving force'" behind the
deprivation; thus, in an official-capacity suit the entity's 'policy or custom' must have
played a part in the violation of federal law." *Graham*, 473 U.S. at 166 (quoting *Polk
Cnty. v. Dodson,* 454 U.S. 312, 326 (1981)).  Johnson must show that an official policy
or custom caused the constitutional violation.  *City of St. Louis v. Praprotnik*, 485
U.S. 112, 122 (1988).  Municipal action can take three forms: (1) an express policy, (2)
an informal but established municipal custom, or (3) an action of a policymaker
authorized to act for the municipality.  *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377 (7th
Cir. 2020), *cert. denied*, 141 S. Ct. 1125 (U.S. Jan. 11, 2021).

Johnson contends that despite having notice of the need for a policy, plan, or
procedure regarding the provision of outside mental health treatment to inmates and
detainees, Sheriff Mellinger neglected to formulate such a plan.  (Johnson's Br. Opp'n
Madison Cnty. Defs.' Mot. Summ. J. 15, ECF No. 125.)  The paragraphs of Sheriff
Mellinger's affidavit Johnson cites for evidentiary support, however, provide no such
factual support.  (*See* Mellinger Aff. ¶¶ 5, 7, 8, ECF No. 106-3.)  Johnson's conclusory
statement that Sheriff Mellinger's failure to comply with the Indiana Administrative

Code was a contributing factor leading to Deputy Ramer's alleged constitutional violations and injuries to Johnson, (*see* Johnson Aff. ¶ 25, ECF No. 124-1), fails to raise a genuine issue of material fact, *see, e.g., FKFJ, Inc. v. Village of Worth*, 11 F. 4th 574, 585 (7th Cir. 2021) (speculation, conjecture, and conclusory allegations are insufficient to overcome a properly supported summary judgment motion). The unrefuted evidence establishes that the Sheriff's Department has no policy or practice that directs or permits the use of mechanical restraints on non-dangerous and/or non-mentally-ill individuals. (Mellinger Aff. ¶ 7, ECF No. 106-3.) And Johnson has no evidence that the Sheriff's Department had a widespread practice of failing to comply with state and constitutional guidance with respect to restraining, detaining, and transporting individuals for mental health purposes. The undisputed evidence is that the Sheriff's Department follows state and constitutional guidance in such matters. (*See id.* ¶ 8.)

Next, Johnson suggests that Sheriff Mellinger failed to train and supervise deputies on how to detain, restrain, and transport persons suspected of mental illness. (Johnson's Br. Opp'n Madison Cnty. Defs.' Mot. Summ. J. 17, ECF No. 125.) Yet Johnson presents no evidence to raise a reasonable inference of a failure to train deputies in this regard. And the evidence is that Deputy Ramer has received training on how to evaluate and respond to members of the public who appear to be suffering from mental illness. (Ramer Aff. ¶ 3, ECF No. 106-1.) This training involved knowledge about the proper practice and procedure for responding to and detaining members of the public based on mental illness under Indiana and federal law. (*Id.*)

Ramer also receives approximately four to six hours of continuing education each year related to responding to members of the public who may be suffering from mental illness. (*Id.* ¶ 4.) Also, Deputy Ramer's activities with Johnson were supervised by Ramer's superior officers, Sergeant Greg Adams and Captain Adam Stephenson. (*Id.* ¶¶ 14, 15.)

Johnson has insufficient evidence to show that an official policy, custom, or practice of the Sheriff's Department caused any of his alleged constitutional deprivations. Therefore, the Sheriff is entitled to summary judgment on the official capacity claims.

### 3. *Deputy Adam Ramer*

Turning to Deputy Ramer, Johnson claims that Ramer unlawfully seized and detained Johnson and used excessive force against him. CHA Defendants contend that Deputy Ramer's seizure and detention of Johnson was reasonable and did not violate Johnson's constitutional rights and that the minimal force used by Ramer was objectively reasonable. They also contend that Deputy Ramer is entitled to qualified immunity.

#### a. *Seizure/Detention*

The constitutionality of a mental-health seizure "does not depend on the particularities of state law," *Bruce v. Guernsey*, 777 F.3d 872, 876 (7th Cir. 2015), but on the Fourth Amendment reasonableness standard, *id.* A mental-health seizure complies with the Fourth Amendment if the officer has probable cause, "which exists 'only if there are reasonable grounds for believing that the person seized is subject to

seizure under the governing legal standard.'" *Id.* at 875 (quoting *Fitzgerald v. Santoro*, 707 F.3d 725, 732 (7th Cir. 2013)). In general, "a mental-health seizure is lawful if there is cause to believe that the person seized is a danger to herself or others." *Id.* at 876. Under the collective knowledge doctrine, "a law enforcement officer may rely on information conveyed to him by another law enforcement officer or the agency for which he works." *Id.*

Under these standards, Johnson cannot show that his seizure by Deputy Ramer violated Johnson's Fourth Amendment rights. Indiana's Immediate Detention law, Indiana Code § 12-26-4-1 *et seq.*, allows "[a] law enforcement officer, having reasonable grounds to believe that an individual has a mental illness, is either dangerous or gravely disabled, and is in immediate need of hospitalization and treatment, to apprehend and transport the individual to a hospital or medical facility." Ind. Code § 12-26-4-1. The law defines "dangerous" as a condition in which "an individual, as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." Ind. Code § 12-7-2-53.

Based on the information provided by the 911 dispatcher, information on which Deputy Ramer could rely, *see Bruce*, 777 F.3d at 876, as well as his own observations of and interaction with Johnson, Deputy Ramer had reasonable grounds to believe that Johnson had a mental illness. Johnson had reported to the 911 dispatcher that Johnson's phone "had murder on it" and his uncle "killed" his girlfriend. (Ramer Aff. ¶ 7, ECF No. 106-1.) When Deputy Ramer first encountered Johnson in the lobby that night, Johnson was scared and appeared to be delusional. (*Id.* ¶ 78.) He said

12

that people were trying to kill him, (*id.* ¶ 9), and that he wanted to go to the Anderson Police Department so police officers could "do something about the person in his phone." (*Id.* ¶ 10.) Ramer believed that Johnson displayed disorganized thoughts and an inconsistent temperament. (*Id.* ¶ 9.)

A short time later, the dispatcher reported to Deputy Ramer that a suspicious person had barricaded himself in the bathroom, was screaming that someone in the Sheriff's Department was going to kill him, and was making multiple 911 calls and hanging up. (*Id.*¶ 12.) When Ramer got to the lobby a second time, he found the bathroom door shut and locked, confirmed that Johnson was inside, and asked him to exit the bathroom. (*Id.* ¶ 13.) Johnson did not exit the bathroom and the deputies had to unlock the door and remove Johnson from the bathroom. (Ramer Aff. ¶¶ 16, 17, 18, ECF No. 106-1.) The deputies tried to calm him down, but to no avail. (*Id.* ¶¶ 19–20.) Based on his experience as a mental health therapist and his training on how to evaluate and respond to members of the public who appear to be suffering from mental illness, Deputy Ramer believed Johnson to be in a state of psychosis because of his paranoia, possible hallucinations, frantic and erratic behavior, and inability to exercise sound judgment. (Ramer Aff. ¶¶ 3, 4, 21, ECF No. 106-1.)

Deputy Ramer also had reasonable grounds to believe that Johnson, as a result of mental illness, presented a substantial risk that he would harm himself or others. Johnson's statements that people were going to kill or harm him gave Deputy Ramer a concern that Johnson may resort to violence if he perceived he was being threatened with physical harm. (*Id.* ¶ 22.) Ramer believed that Johnson was a danger to himself

and others, (*id.* ¶ 23), and based on Ramer's beliefs that Johnson was suffering from a mental illness and posed a danger to himself and others, Ramer had reason to believe that Johnson was in immediate need of mental health evaluation and treatment.  Therefore, Deputy Ramer had reasonable grounds to believe that Johnson was subject to seizure under Indiana's Immediate Detention law.  But even if he lacked reasonable grounds to believe that Johnson was subject to seizure under that law, Ramer could have reasonably believed that Johnson was subject to such seizure and is therefore protected by qualified immunity.  Therefore, Ramer is entitled to summary judgment on the individual and official capacity claims for unlawful detention/seizure.

### b.  Excessive Force

The Fourth Amendment's reasonableness standard applies to a claim for the use of excessive force.  *Turner v. City of Champaign*, 979 F.3d 563, 567–68 (7th Cir. 2020).  The reasonableness standard is objective and fact intensive, "asking whether each use of force was reasonable under the totality of the circumstances, 'including . . . whether [the detainee] poses an immediate threat to the safety of the officers or others" and the officer's awareness of the detainee's suspected mental illness.  *Id.*  With the right to effect a mental-health seizure of a person comes the right to use reasonable force to effect the seizure.  *Graham v. O'Connor*, 490 U.S. 386, 396 (1989) ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.");  *Turner*, 979 F.3d at 569 (noting the right to use reasonable force to effect a seizure "applies

to protective detention as well").

Johnson states that Deputy Ramer used more force than necessary to remove Johnson from the bathroom and to secure and handcuff him.  (Johnson Aff. ¶ 20, ECF No. 124-1.)  Johnson has not responded to Defendants' argument that the force Deputy Ramer used was objectively reasonable and constitutional under the circumstances.  "The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."  *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014).  But the Court need not rely on Johnson's waiver here.  The only evidence Johnson offers is that after being handcuffed, he complained that the handcuffs were too tight.  (Johnson Aff. ¶ 13, ECF No. 124-1.)  Johnson does not explain whether he complained more than once about his handcuffs, and he does not allege that the handcuffs caused him any injury, or that such injuries required medical care.  Deputy Ramer believed that Johnson was suffering from a mental illness and was a danger to himself and others.  A general complaint that the handcuffs were too tight does not render Deputy Ramer's slight use of force to secure Johnson objectively unreasonable under the circumstances.  *See, e.g.*, *Stainback v. Dixon*, 569 F.3d 767, 773 (7th Cir. 2009) ("These generalized complaints, without any elaboration regarding a preexisting injury or other infirmity, would not have placed a reasonable officer on notice that [the arrestee] would be injured by these actions."); *Tibbs v. City of Chicago,* 469 F.3d 661, 666 (7th Cir. 2006) (arresting officer did not act unreasonably when he fastened the plaintiff's handcuffs too tightly, and the plaintiff, whose injuries did not require medical care, complained

only once about his handcuffs "without elaborating on any injury, numbness, or degree of pain"). Therefore, Ramer is entitled to summary judgment on the individual and official capacity excessive-force claims.

### III. CHA Defendants

#### A. *Events at the Hospital*

Christopher E. Miller, M.D., is an emergency medicine physician employed by EPCHA, P.C., which provides emergency medicine physicians to the CHA Emergency Department. (Christopher E. Miller Aff. ¶ 1, ECF No. 92-1.) On February 25, 2020, at approximately 3:15 a.m., Johnson presented to the CHA Emergency Department under an Immediate Detention form from the Sheriff's Department. (*Id.*) Miller provided care and treatment to Johnson in the Emergency Department. (*Id.* ¶ 3.) Miller learned that Johnson had been at the Madison County Jail, where he was permitted to stay in the lobby to stay warm. (*Id.* ¶ 5.) Miller was advised that Johnson had acted in a bizarre manner, had barricaded himself in the bathroom, and was experiencing hallucinations. (*Id.*)

During Miller's physical examination, Johnson was agitated and very animated. (Miller Aff. ¶ 7, ECF No. 92-1.) Miller ordered a urine drug screen, the results of which were positive for marijuana, methamphetamine, amphetamine, and benzodiazepines. (*Id.* ¶ 8.) Following the physical examination, Johnson was placed in line for a telepsychiatry evaluation by Community North Crisis and was to remain in the Emergency Department until he had that evaluation. (Miller Mot. Summ. J., Ex. B, CHA Records at 238, ECF No. 92-2; Miller Aff. ¶ 9, ECF No. 92-1.)

Around 3:30 a.m., while on duty at CHA, Officer Jason Thomas and Officer Phillip Allen were notified by Madison County Sheriff deputies that Johnson was being brought to the Emergency Department on an Immediate Detention form for evaluation. (Phillip Allen Aff. ¶¶ 1, 2, ECF No. 97-8; Jason Thomas Aff. ¶¶ 1, 4, ECF No. 97-9.) Thomas was also notified that Johnson had been acting in a bizarre manner at the jail, that he had destroyed a kiosk in the lobby, and that he had removed his clothes and barricaded himself in the bathroom. (Jason Thomas Aff. ¶ 5, ECF No. 97-9.) Officer Allen was asked to come to the Emergency Department to assist with Johnson for the safety of Johnson and the Hospital staff. (Allen Aff. ¶¶ 3, 4 ECF No. 97-8.) Officer Thomas reported to the Emergency Department to assist Officer Allen. (*Id.* ¶ 6.)

While in the Emergency Department, Officers Allen and Thomas monitored Johnson to ensure that he did not harm himself or others. (Miller Aff. ¶ 10, ECF No. 92-1.) Johnson alternated between being calm and agitated. (Thomas Aff. ¶ 8, ECF No. 97-9.) He stated multiple times that he wanted to leave. (*Id.* ¶ 9.) Johnson was told that he was not in trouble and was not going to jail; and that it was important to try to stay calm because the outcome of the mental health evaluation depended on him and on demonstrating that he was not in need of mental health detention. (*Id.* ¶ 10.)

While at the Hospital and monitored by the officers, Johnson alternated between being calm and agitated, (Thomas Aff. ¶ 8, ECF No. 97-9), and then became visibly agitated, (Thomas Aff. ¶ 12, ECF No. 97-9; Miller Mot. Summ. J., Ex. B, CHA Records

at 238, ECF No. 92-2).  A nurse told Johnson that he likely would be there for several hours waiting for his telepsychiatry evaluation.  (Miller Mot. Summ. J., Ex. B, CHA Records at 238, ECF No. 92-2.)  However, no one informed Johnson that he was required to stay at the Hospital until he was evaluated.  (Johnson Aff. ¶ 11, ECF No. 121-1.)  Because of Johnson's agitation, Officers Allen and Thomas, who were in the exam room with Johnson, began gathering items, such as the telephone cord and bedside table items, that Johnson could use to hurt himself or others.  (Allen Aff. ¶¶ 8, 9, ECF No. 97-8; Thomas Aff. ¶ 13, ECF No. 97-9.)  Officer Thomas asked Johnson for his cell phone.  (Thomas Aff. ¶ 14, ECF No. 97-9.)  As Johnson was handing over his phone, he suddenly got up and ran from the exam room, grabbing and throwing items, like the trash can, as he ran out of the room, down the hallway, and into an unoccupied exam room.  (Miller Mot. Summ. J., Ex. B, CHA Records at 238, ECF No. 92-2; Allen Aff. ¶ 11, ECF No. 97-8; Thomas Aff. ¶ 15, ECF No. 97-9; Miller Aff. ¶ 11, ECF No. 92-1.)  Johnson explains that he ran out of the room because Officer Thomas had unplugged the Hospital room telephone and approached him "like he [Thomas] was going to strangle him [Johnson] with [the telephone cord]." (Johnson Aff. ¶¶ 12, 13, ECF No. 126-1.)  The officers chased after Johnson.  (Miller Mot. Summ. J., Ex. B, CHA Records at 238, ECF No. 92-2.)

The parties dispute exactly what happened next, but there is no dispute that eventually Johnson was taken down by Officer Thomas and then Officer Thomas tased Johnson twice.  (Miller Mot. Summ. J., Ex. B, CHA Records at 238, ECF No. 92-2; Johnson Aff. ¶¶ 12, 32, ECF No. 121-1.)  Johnson says that he was physically

assaulted by Officer Thomas and that Johnson did nothing to provoke Thomas or threaten him with bodily injury. (Johnson Aff. ¶¶ 12, 14, ECF No. 121-1.)  Johnson also says that Officer Allen could have intervened to prevent or stop Officer Thomas from assaulting and tasing Johnson, but Allen did not do so. (*Id.* ¶ 13.)  Johnson was given no verbal warning or command to stop before he was tased. (Johnson Aff. ¶ 30, ECF No. 121-1.)  After Johnson was tased the second time, the officers placed him in handcuffs. (Thomas Aff. ¶ 27, ECF No. 97-9.)  Then the medical and nursing staff came into the room and gave Johnson a sedative. (Thomas Aff. ¶ 29, ECF No. 97-9.)

Because Johnson had remained erratic and dangerous to himself and others when less restrictive means were employed, Dr. Miller ordered an injection of Haldol and Ativan as well as mechanical restraints. (Miller Aff. ¶¶ 13, 17, 21, 2, 14, ECF No. 92-1.)  Miller's shift ended at 6:00 a.m. and thereafter, Johnson was no longer under Miller's care and treatment. (*Id.* ¶ 16.)

Upon evaluation by Community North Crisis, it was determined that Johnson did not require admission for psychiatric treatment, and he was discharged from CHA to the Madison County Jail at 9:40 p.m. on February 25, 2020. (Miller Mot. Summ. J., Ex. B at 266, ECF No. 92-2.)  Johnson was arrested for battery on an officer and resisting law enforcement and was taken to the jail. (Allen Aff. ¶ 32, ECF No. 97-8.)

At all times relevant, Bryan Mills has been the President and C.E.O. of Community Health Network, Inc. ("CHNw"), which is a privately owned non-profit integrated healthcare system in Central Indiana providing a full continuum of care that integrates hundreds of physicians, hospitals, and other health services. (Bryan

Mills Aff. ¶¶ 1, 2, ECF No. 97-1.)  Mills has responsibility for the overall operations
of CHNw and its subsidiary members like CHA and CHA-PD.  (Bryan Mills Aff. ¶ 3,
ECF No. 97-1.)  He is not involved in the day-to-day operations of CHA or CHA-PD.
(*Id.* ¶ 4.)  He would not have been involved in the drafting, approval, or
implementation of policies and procedures at CHA or CHA-PD.  (*Id.* ¶ 5.)  Mills was
not present at CHA when Johnson was at the Hospital on February 25, 2020; Mills
has never met or spoken with Johnson; and Mills had no knowledge of Johnson before
this lawsuit was filed.  (*Id.* ¶¶ 7–9.)

Beth Tharp has responsibility for the overall operations of CHA, including CHA-
PD.  (Beth Tharp Aff. ¶¶ 1, 3, ECF No. 97-2.)  She was not involved in the day-to-day
operation and function of the CHA-PD.  (*Id.* ¶ 4.)  Tharp was not directly involved in
the drafting, approval, or implementation of policies and procedures at CHA or CHA-
PD.  (*Id.* ¶ 5.)  Tharp has never met or spoken with Johnson. (*Id.* ¶ 2.)  She had no
personal involvement or interaction with anyone involved with Johnson's detention,
admission, care, or treatment at the Hospital on February 25, 2020.  (*Id.* ¶ 9.)

Bonnie Corbey has been employed at CHA as Clinical Care Coordinator.  (Bonnie
Corbey Aff. ¶¶ 1, 2, ECF No. 97-3.)  Part of her role in that position is to participate
in the creation, maintenance, and revision of various policies and procedures
applicable to the patient care services area at CHA.  (*Id.* ¶ 3.)  A policy titled: Care of
the Violent or Emotionally Disturbed Patient, PolicyStat ID: 5884165, was in effect
in February 2020.  (*Id.* ¶ 5.)  Corbey participated in the creation, maintenance, and
revision of the policy, which provides guidance for addressing patients who exhibit

threatening or disruptive behavior.  (*Id.* ¶¶ 5, 6.)  The policy was created for the safety of patients, staff, and others at CHA.  (Corbey Aff. ¶ 16, ECF No. 97-3.)  The policy references and was written to be consistent with the statutory provisions that apply when a patient is brought to CHA with an Immediate Detention order under Indiana Code § 12-26-4-1 *et seq.*  (Corbey Aff. ¶ 7, ECF No. 97-3.)  Corbey is not the final policymaker for CHNw, CHA, or CHA-PD.  (*Id.* ¶¶ 11–12.)  She has never met or spoken with Johnson.  (*Id.* ¶ 8.)  Corbey was not involved in and did not witness the events at CHA on February 25, 2020, which form the basis of this lawsuit.  (*Id.* ¶ 10.)

Phil Caldwell is the Chief of Police for CHA-PD.  (Phil Caldwell Aff. ¶ 1, ECF No. 97-5.)  The governing board of CHA established CHA-PD under Indiana Code § 16-18-4-1 *et seq.*  (*Id.* ¶ 2.)  Chief Caldwell was not personally involved in, nor did he witness the events of February 25, 2020, that are the subject of this lawsuit.  (*Id.* ¶ 3.)  Caldwell has never met or spoken with Johnson.  (*Id.* ¶ 4.)  Chief Caldwell was involved in the creation of the policy "Security Arrest Policy," applicable to the patient care services area at CHA and in effect in February 2020.  (*Id.* ¶¶ 5, 6.)  He created the policy "Chief's General Order to Resistance," which is applicable to CHA-PD and was in effect in February of 2020.  (*Id.* ¶ 7.)  The Security Arrest Policy and the Chief's General Order to Resistance are written with the goal of protecting, promoting, and effectuating the safety of patients, medical staff, police officers, and others on the Hospital campus within the statutory powers granted to and held by CHA-PD officers.  (*Id.* ¶ 8.)  However, Caldwell was and is not the final policymaker for CHA-PD; that responsibility lies with the Hospital's governing board.  (*Id.* ¶¶ 9, 10.)

## B. Discussion

Johnson alleges that CHA and CHNw have implemented a policy allowing without due process of law the involuntary detention and hospitalization of persons suspected of mental health crises and have allowed such persons to be treated by law enforcement officers and an Emergency Department physician who is not licensed or qualified to provide psychiatric treatment. He also alleges that CHA Defendants have a policy that allows persons suspected of suffering from mental health crises to be involuntarily and unconstitutionally stabilized through psychotropic medication and forcible restraint. Johnson claims he was confined, restrained, and forcibly medicated with antipsychotic drugs in violation of his Fourth and Fourteenth Amendment rights. He also alleges that Officer Thomas used excessive force against him and that Officer Allen failed to intervene to prevent the constitutional violation.

CHA Defendants move for summary judgment. They argue that Mills, Tharp, Corbey, and Caldwell: (1) were not state actors and therefore cannot be held liable under § 1983; (2) cannot be held individually liable because they were not personally responsible for any alleged constitutional deprivation; and (3) that the claims against them in their official capacities are duplicative of the claims against the corporate entities. CHA Defendants also contend that CHNw, CHA, and CHA-PD: (1) are not state actors; and (2) Johnson has insufficient evidence to support *Monell* liability. As for Officers Allen and Thomas, CHA Defendants argue that these officers' conduct was objectively reasonable and they are shielded by qualified immunity. In addition, CHA Defendants contend that Johnson's immediate detention complied with Indiana

22

law, and that Johnson cannot pursue his private ADA claims under § 1983, that Title II of the ADA is inapplicable, and that Title III cannot provide any relief.

### 1. State Action

In typical § 1983 cases, the defendant "is an officer or employee of state government, and it is easy to conclude that the person's actions are fairly attributable to the state." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009). But when "a plaintiff brings a Section 1983 claim against a defendant who is not a government official or employee, the plaintiff must show that the private entity acted under the color of state law." *Id.* at 822. This "important statutory element . . . sets the line of demarcation between those matters that are properly federal and those matters that must be left to the remedies of state tort law." *Id.* at 822–23. The "under color of law" requirement of § 1983 has the same meaning as the "state action" requirement of the Fourteenth Amendment. *See West*, 487 U.S. at 49 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982)).

In opposing the state-actor arguments, Johnson responds that under controlling precedent, Defendants acted under color of state law. A private party can be held responsible as a state actor: (1) "where the state effectively directs or controls the actions of the private party such that the state can be held responsible for the private party's decision," *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 628 (7th Cir. 1999) (concluding that medical center's security guards could be held liable under § 1983 as state actors); (2) "when the state delegates a public function to a private entity," *id.*; *see also United States v. Hoffman*, 498 F.2d 879 (7th Cir. 1974)

(holding privately employed railroad police officers by delegation of legislative authority acted under color of state law while on duty with same powers as city police); or (3) when the private party is a "willful participant in joint action with the State or its agents," *L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)).  Johnson does not argue the first theory.  He does, however, argue the second and third theories.

Regarding the second theory, Johnson argues that by delegation of legislative authority under Indiana Code § 16-18-4-2, the governing Board of CHA created CHA-PD and CHA-PD officers are granted general police powers.  (Johnson Br. Opp'n CHA Defs.' Mot. Summ. J. 9–10, ECF No. 122.)  Johnson therefore submits that CHA-PD officers act under color of state law in performing their police functions.  (*Id.* at 10.)  The delegation of authority extends to the actions of CHA-PD Officers, but not the other CHA Defendants.  Johnson does not identify any action that those other CHA Defendants allegedly took by delegation of a public function.

Rather, Johnson maintains that those other Defendants acted in their "official capacities."  (Johnson Br. Opp'n CHA Defs.' Mot. Summ. J. 10, ECF No. 122.)  Yet "employees of private companies, not a state or local government, . . . ha[ve] no official capacities in which . . . [to] be sued." *Ellibee v. Leonard,* 226 F. App'x 351, 357 (5th Cir. 2007); *Brueck v. John Maneely Co.*, No. 2:14–CV–227 JD, 2014 WL 5817544, at *1 (N.D. Ind. Nov. 10, 2014) (quoting *Ellibee*); *Clark v. Kalteski*, No. 5:22-cv-81-JDW, 2022 WL 377402, at *6 (E.D. Pa. Feb. 8, 2022) ("Generally, a suit against a [ ] public officer in his or her official capacity is used to compel that officer to take

some official action [and that] concept . . . is inapplicable to suits against private parties where the entity is also susceptible to suit.").

In addition, contrary to Johnson's view, (*see* Johnson Br. Opp'n CHA Defs.' Mot. Summ. J. 10, ECF No. 122), *West v. Atkins*, 487 U.S. 42, 54 (1988), and *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982), do not provide authority for concluding that any of the CHA Defendants (other than the two CHA-PD officers) acted under color of state law.  In *West*, the Supreme Court held that a physician who is under contract with the state to provide medical services to inmates at a state-prison hospital acted "under color of state law" within the meaning of § 1983 when treating an inmate.  487 U.S. at 54.  Although Johnson suggests that CHA was designated by the Sheriff's Department as the hospital to take persons, presumably detainees and inmates, in need of outside medical treatment, (Johnson Suppl. Aff. ¶ 5, ECF No. 141-1), CHA is not a state hospital and Johnson has not presented any evidence that CHA or any of the CHA Defendants have contracted with the State to provide services to inmates.  In *Lugar*, the Supreme Court held that a private party's joint participation with state officials in the seizure of property was sufficient to characterize that party as a "state actor" for purposes of the Fourteenth Amendment.  457 U.S. at 941–42.  Under this third state-action theory, a plaintiff must produce "evidence of a *concerted effort*" between a state actor and the private person to support a finding that the deprivation committed by the private person is "fairly attributable to the state." *L.P.*, 852 F.3d at 696 (quotations omitted; emphasis in original).  Johnson asserts that CHA Defendants acted jointly and in concerted action with state actors, but he focuses on

Officer Thomas to the exclusion of all the others.  (*See* Johnson Br. Opp'n CHA's Mot. Summ. J. 11, ECF No. 122.)  As Johnson acknowledges, to sustain a § 1983 action against a private person under the joint-activity or concerted-action theory, a plaintiff must produce some evidence of "a *concerted effort* between a state actor and that individual."  *L.P.*, 852 F.3d at 696 (quotations omitted; emphasis in original).

Johnson appears to rely on CHA's policy on immediate detention as a basis for finding concerted action—"Care of the Violent or Emotionally Disturbed Patient" (PolicyStat ID: 5884165).  (*See* Johnson Br. Opp'n CHA Defs.' Mot. Summ. J. 11, ECF No. 122.)  This CHA policy was drafted to support and is consonant with Indiana's Immediate Detention law, Indiana Code §§ 12-26-4-1 to -9.[8]  *Spencer v. Lee*, 864 F.2d 1376 (7th Cir. 1989) (en banc), *cert. denied,* 494 U.S. 1016 (1990), which addressed § 1983's under-color-of-state-law requirement in a factual context similar to that presented here, provides guidance.

In *Spencer*, the Seventh Circuit considered whether "a private physician and a private hospital act under color of state law . . . when they commit a mentally disturbed person."  *Id.* at 1377.  The patient-plaintiff sued the physician for a deprivation of liberty without due process.  The plaintiff argued that the physician and hospital were state actors because they were "deputized" by the state under the Illinois Mental Health Code "to carry out the exclusive state function of committing

---

[8] Johnson's conclusory assertions that this policy, CHA-PD's "Chief's General Orders to Resistance," and CHA-PD's "Restraint & Seclusions Policy" were written to engage in undue discrimination against persons allegedly mentally ill, (Johnson Aff. ¶¶ 23–27, ECF No. 121-1), are insufficient to create any triable issue.  As the non-moving party, he "may not rest . . . upon conclusory statements in affidavits."  *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (cleaned up, quotation marks and citation omitted).

the mentally ill." *Id.* at 1378. The court found no suggestion that the provisions were enacted because the state wanted to encourage or compel commitments, *id.* at 1379, and rejected the argument that involuntary civil commitment of the mentally ill was traditionally a governmental function, *id.* at 1379–81. Therefore, the court held that the private physician and hospital were not state actors. *Id.*

As in *Spencer*, Johnson claims that a private physician and private hospital CHA detained him against his will and injured him by providing inappropriate medical treatment. The mere existence of CHA's Policy on the Care of the Violent or Emotionally Disturbed is not enough to show concerted action with the state. *Spencer* teaches that the treatment and involuntary commitment of persons with mental illness is not a government function. *See* 864 F.2d at 1379–80. This case is about immediate detention rather than a longer commitment, but in the Court's view, that should not make a difference.

Johnson has presented no admissible evidence that Mills, Tharp, Corbey, Caldwell, CHNw, and CHA are state actors. Thus, the Court concludes that these CHA Defendants are not state actors and they cannot be held liable under § 1983. Thus, they are entitled to summary judgment.

As for the CHA-PD officers, Johnson asserts that before he was transported and detained at the Hospital, the Sheriff's deputies notified Officer Thomas of their plan to transport Johnson and confine him in the Emergency Department. (Johnson Br. Opp'n CHA Defs.' Mot. Summ. J. 11 (citing Madison Cnty. Defs., Ex F, Jason Thomas Aff. ¶ 4 (sheriff deputies notified him that Johnson was being brought to the

Emergency Department on an Immediate Detention Order for evaluation), ECF No. 122.))   The Court need not decide whether that evidence is sufficient to show a concerted effort between the sheriff's deputies and Officer Thomas, however.   CHA Defendants have not argued that either Officer Thomas or Officer Allen *cannot* be held liable *as* a state actor.

### 2. *Personal Involvement, Official-Capacity Claims, and Monell*

Even if the CHA Defendants other than the CHA-PD officers could be held responsible as state actors, there are other bases on which they are entitled to summary judgment.   First, "[a]n *individual* cannot be held liable in a § 1983 action unless he caused or participated in [the] alleged constitutional deprivation."   *Starzenski v. City of Elkhart,* 87 F.3d 872, 879 (7th Cir. 1996) (quoting *Wolf–Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir. 1983)).   Johnson has offered no admissible evidence to dispute the evidence that Mills, Tharp, Corbey, and Caldwell did not cause or participate in the alleged constitutional deprivations.   As a result, those Defendants cannot be held personally responsible for any such deprivation and the § 1983 claims against them must be dismissed.

Second, CHA Defendants maintain that the claims against Mills, Tharp, Corbey, and Caldwell in their official capacities are duplicative of the claims against the corporate entities.   The official-capacity claims are arguably not cognizable because "employees of private companies, not a state or local government, . . . ha[ve] no official capacities in which . . . [to] be sued."   *Ellibee v. Leonard,* 226 F. App'x 351, 357 (5th Cir. 2007); *see also Brueck v. John Maneely Co.*, No. 2:14–CV–227 JD, 2014

WL 5817544, at *1 (N.D. Ind. Nov. 10, 2014) (quoting *Ellibee*); *Clark v. Kalteski*, No. 5:22-cv-81-JDW, 2022 WL 377402, at *6 (E.D. Pa. Feb. 8, 2022) ("Generally, a suit against a [ ] public officer in his or her official capacity is used to compel that officer to take some official action [and that] concept . . . is inapplicable to suits against private parties where the entity is also susceptible to suit."). Even if the official-capacity claims against these individuals were cognizable, the claims would be treated as claims against the corporate entity for which each individual works. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). Thus, the claims against Mills, Tharp, Corbey, and Caldwell in their official capacities would be dismissed as duplicative of the claims against the corporate entities.

Third, Johnson has insufficient evidence to hold the corporate entities liable under *Monell*. The Seventh Circuit has extended *Monell* from municipalities to private corporations. *E.g.*, *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009). "Like a municipality, a private corporation can be liable if the injury alleged is the result of a policy or practice, or liability can be 'demonstrated indirectly by showing a series of bad acts and inviting the court to infer from them that the policy-making level of [the corporation] was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned . . . the misconduct of subordinate[s].'" *Johnson v. Dossey*, 515 F.3d 778, 782 (7th Cir. 2008) (quoting *Woodward v. Corr. Med. Servs.*, 386 F.3d 917, 927 (7th Cir. 2004)). Johnson states that "unconstitutional policies and practices" of CHNw, CHA, and CHA-PD were the driving force contributing to his injuries. (Johnson Br. Opp'n CHA Defs.'

Mot. Summ. J. 9, ¶ 30, ECF No. 122; Johnson Aff. ¶ 36, ECF No. 121-1.)   But Johnson's conclusory assertions in his affidavit do not raise a triable issue.   *See, e.g.*, *FKFJ, Inc. v. Village of Worth*, 11 F. 4th 574, 585 (7th Cir. 2021) (mere speculation, conjecture, and conclusory allegations are insufficient to overcome a properly supported summary judgment motion).   Johnson has no evidence that any of his injuries were caused by a person with final policymaking authority.   And Johnson has not even attempted to show that his alleged injuries were caused by a widespread practice.   Johnson has not presented sufficient evidence to support *Monell* liability; this is another reason why CHNw, CHA, and CHA-PD should be granted summary judgment on all claims against them.

### 3. *Qualified Immunity*

Returning to Officers Thomas and Allen, CHA Defendants argue that the officers are entitled to qualified immunity.   "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White* v. *Pauly*, 580 U.S. ——, ——, 137 S. Ct. 548, 551 (2017) (per curiam) (internal quotation marks and citation omitted). Johnson responds that private parties are not entitled to assert qualified immunity. Curiously, CHA Defendants fail to acknowledge this argument in their reply.

In *Wyatt v. Cole*, 504 U.S. 158 (1992), the Supreme Court held that unlike certain government officials, private defendants charged with § 1983 liability for invoking state replevin, garnishment, and attachment statutes later declared unconstitutional were not entitled to qualified immunity from suit.   The Court first looked to whether

private defendants enjoyed immunity at common law from analogous torts—they did not. *Id.* at 164. Then the Court examined the policy considerations for qualified immunity—"to preserve [government officials'] ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service"—and determined that "[t]hese rationales are not transferable to private parties." *Id.* at 167–68. Thus, in some cases private parties can be held liable under § 1983 yet not be entitled to assert qualified immunity.

Later in *Richardson v. McKnight*, 521 U.S. 399, 401 (1997), the Supreme Court decided that privately employed prison guards were not entitled to qualified immunity from a § 1983 lawsuit. In doing so, the Court again looked to history and concluded that correctional functions have never been exclusively public and that private contractors managing prisons historically have not been granted immunity from suit for their intentional misconduct. *Id.* at 404–07. The Court also considered qualified immunity's purposes (*i.e.,* to protect the public from unwarranted timidity on the part of public officials, to insure that talented candidates are not deterred from entering public service, and to avoid distracting officials from their governmental duties) and concluded they do not support the application of immunity to private prison guards. *Id.* at 408–12. The Seventh Circuit has declined to extend qualified immunity to a privately employed nurse working at a county jail. *Estate of Clark v. Walker*, 865 F.3d 544, 550–51 (7th Cir. 2017).

The CHA-PD Officers are like the privately employed prison guards in *Richardson*. Although the officers perform police functions, they do so on behalf of

CHA, and the officers are employed by CHA, not by the State. Even if historically, private police would have been granted immunity—and the Court is unaware that they were—policy considerations do not weigh in favor of finding immunity in this case, as explained in *Payton v. Rush-Presbyterian-St. Luke's Medical Center*, 82 F. Supp. 2d 901 (N.D. Ill. 2000) (holding hospital's security officers were not entitled to assert qualified immunity).

Rush Medical Center was a non-profit hospital that employed private security personnel. *Id.* at 905. Under a Chicago Ordinance, the security guards were licensed as "special police" and subject to the rules and regulations governing City police officers. *Id.* In deciding whether the guards could assert immunity, the district court applied *Richardson*'s test, looking at history and public policy. *Id.* at 905–07. Finding no relevant historical evidence concerning immunity for special police, the court considered the public policy. The court determined that as in *Richardson*, ordinary marketplace pressures provided the not-for-profit hospital the incentive to avoid employing guards who do not perform adequately or responsibly. *Id.* at 906. In addition, the hospital independently employed and supervised the security guards with little government supervision and the hospital had insurance to cover events like the one that formed the basis of the lawsuit. And the hospital controlled the guard's salaries and benefits and could offset any increased employee liability. *Payton*, 82 F. Supp. 2d at 906–07. Because the *Richardson* Court had "downplayed the third and last policy consideration, distraction from potential lawsuits," and since the first two considerations did not weigh in favor of finding immunity, the court did

not analyze that consideration.  *Id.* at 907.  The *Payton* court concluded that the security guards could not overcome the presumption "against immunity for private actors," and held that the guards were not entitled to assert qualified immunity.  *Id.* at 908.

The same result obtains here.  Like Rush Medical Center, CHA, though non-profit, finds appropriate incentives in ordinary marketplace pressures to avoid employing police who perform their jobs with timidity or overly aggressiveness.  Presumably CHA has insurance to cover events like the one that underlies Johnson's lawsuit and controls the CHA-PD's officer's salaries and benefits.  Besides, CHA Defendants have not even addressed Johnson's challenge to their assertion of qualified immunity for the officers.  Even though Johnson raised this issue, their reply brief remained silent.  Thus, they have waived any arguments that could have been made in favor of finding the CHA-PD officers entitled to assert qualified immunity.  *See, e.g.*, *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999); *see also Palmer v. Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003).  Therefore, the Court finds that the privately employed CHA-PD Officers Thomas and Allen are not entitled to assert qualified immunity.

### 4.   *Unlawful Detention, Excessive Force, and Failure to Intervene*

As CHA Defendants acknowledge, qualified immunity is intertwined with the facts of each case.  *See Alvarado v. Picur*, 859 F.3d 448, 450 (7th Cir. 1988).  And in their reply brief, CHA Defendants argue that Officer Thomas and Officer Allen acted reasonably under the circumstances presented.  However, "[a]s a general matter, if

the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006). CHA Defendants did not seek summary judgment on the ground that Johnson has insufficient evidence from which a reasonable jury could find a Fourth Amendment violation based on the use of force against him. And even if the Court were to consider the reasonableness of the particular use of force against him, the present record raises genuine issues of material fact that would preclude summary judgment in favor of Officer Thomas on Johnson's claims that the use of force violated Johnson's constitutional rights and that Officer Allen failed to intervene in the use of excessive force/excessive tasing.

CHA Defendants submit that given the reasons for Johnson's Immediate Detention Order, Johnson's physical size (he reported he was 5'11" tall and 200#) and strength, state of mind, and combative behavior, deploring the taser to thwart Johnson's escape and subdue him was reasonably necessary. (CHA Defs.' Br. Support Summ. J. 31, ECF No. 96; Miller Mot. Summ. J., Ex. B, CHA Records at 230, ECF No. 92-2.) They assert that Johnson was "unreasonably and strongly resisting; not complying with instructions to stop resisting, and . . . showing no signs that he would comply." (*Id.*) Defendants continue by stating that "after being warned and given an opportunity to comply, [Johnson] was tased." (*Id.*) In sum, Defendants say there was "a major risk of injury" to Johnson, Officers Thomas and Allen, as well as Hospital staff and patients in the Emergency Department. (*Id.*)

34

Johnson, on the other hand, states that he was never told by anyone that he was required to stay at the Hospital until he had a mental health evaluation, that he did not provoke the officers or threaten them with bodily injury, and he was not given a verbal warning or command to stop before he was tased.  (Johnson Aff. ¶¶ 11, 14, 30, ECF No. 121-1.) Johnson also states that he did not try to escape from the Emergency Department but ran out of his exam room because Officer Thomas approached him with the telephone cord "like he [Thomas] was going to strangle him [Johnson] with it."  (Johnson Aff. ¶ 13, ECF No. 126-1.)   Johnson argues that based on Officer Thomas's assurances that Johnson was not in trouble, not under arrest, and not going to jail, along with the failure to inform him that he was required to stay in the Hospital until cleared by mental health professionals, Johnson was misled into believing that he was free to walk away and leave.  (Johnson Br. Opp'n CHA Defs.' Mot. Summ. J. 15–16, ECF No. 122; *see* Thomas Aff. ¶ 10, 97-9.)  But Johnson did not simply attempt to walk away; he admits that he ran out of the exam room, (Johnson Aff. ¶ 13, ECF No. 126-1), and the video from the Hospital that night shows Johnson running down the hallway and into another exam room with Officers Thomas and Allen in pursuit.   Nonetheless, given the disputed factual issues, the Court cannot resolve the excessive-force claims on summary judgment.  Under Johnson's version of events, a jury could find Officer Thomas's use of force unreasonable.  And the failure-to-intervene claim against Officer Allen, which also depends on whether Officer Thomas's use of force was reasonable, cannot be decided on summary judgment either.   Therefore, the Court finds that CHA Defendants' motion for

summary judgment should be denied as to the excessive-force claim against Officer Thomas and the failure-to-intervene claim against Officer Allen.

In moving for summary judgment, however, CHA Defendants did argue that Johnson's immediate detention at the Hospital complied with Indiana law, thus defeating any claim for unconstitutional seizure. As part of that argument, they asserted that a law enforcement officer—Deputy Ramer—provided reasonable grounds to believe that Johnson had a mental illness, was dangerous, and was in immediate need of hospitalization and treatment. (CHA Defs.' Br. Support Mot. Summ. J. 34, ECF No. 96.) And Johnson has responded to that argument. (Johnson Br. Opp'n CHA Defs.' Mot. Summ. J. 13–15, ECF No. 122.)

As noted, the constitutionality of a mental-health seizure "does not depend on the particularities of state law," *Bruce v. Guernsey*, 777 F.3d 872, 876 (7th Cir. 2015), but on the Fourth Amendment reasonableness standard, *id.* More specifically, mental health seizures comply with the Fourth Amendment if officers have probable cause, which exists 'only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard.'" *Bruce*, 777 F.3d at 875 (quoting *Fitzgerald v. Santoro*, 707 F.3d 725, 732 (7th Cir. 2013)). In general, "a mental-health seizure is lawful if there is cause to believe that the person seized is a danger to herself or others." *Id.* at 876. Under the collective knowledge doctrine, "a law enforcement officer may rely on information conveyed to him by another law enforcement officer or the agency for which he works." *Id.*

36

Under these standards, Johnson cannot show that his seizure and detention by Officer Thomas and Officer Allen violated his Fourth Amendment rights. The officers knew that Johnson was being brought to the Emergency Department on an Immediate Detention Order for evaluation. (Phillip Allen Aff. ¶ 2, ECF No. 97-8; Jason Thomas Aff. ¶ 4, ECF No. 97-9.) The officers were notified by Deputy Ramer that Johnson had been acting in a bizarre manner at the jail, had destroyed a kiosk in the lobby, and had removed his clothes and barricaded himself in the bathroom. (Jason Thomas Aff. ¶ 5, ECF No. 97-9; see also Ramer Aff. ¶ 25 (stating he reported his concerns about Johnson's conduct and statements to the dispatch and officers), ECF No. 106-1.) Officers Thomas and Allen could properly rely on the information provided by Deputy Ramer, *see Bruce*, 777 F.3d at 876. That information alone could give Officers Thomas and Allen reasonable grounds for believing that Johnson was a danger to himself or others and thus subject to seizure under Indiana law, *see Bruce*, 777 F.3d at 875–876., but there's more.

Johnson argues that Deputy Ramer informed Officer Thomas that Johnson did not pose a danger to himself or others, but Johnson provides no citation to the record to substantiate this assertion. (*See* Johnson Br. Opp'n CHA Defs.' Mot. Summ. J. 11 (citing "Madison County, Ex. "), ECF No. 122); *see Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)) ("even *pro se* litigants must follow rules of civil procedure"). And the record evidence is to the contrary. Deputy Ramer has stated that based on his training and observations of Johnson, Ramer had concerns that Johnson may resort to violence if he perceived

37

he was being threatened with physical force, and Ramer believed that Johnson was a danger to himself or others.   (Adam Ramer Aff. ¶¶ 21–23, ECF No. 106-1.) Consistent with those beliefs, Deputy Ramer completed an Immediate Detention Form for Johnson, under Indiana Code § 12-26-4-2, indicating that Ramer believed Johnson was suffering from mental illness and or substance abuse/addiction, and was a danger to others and in need of immediate hospitalization.  (Adam Ramer Aff. ¶ 25 & Ex. A, ECF No. 106-1 & -2.)  Johnson is right that Ramer did not indicate on the Immediate Detention form that Johnson was a danger to himself.   But Johnson's statement in his affidavit that Deputy Ramer also indicated on the Immediate Detention form that "Johnson did not . . . pose a danger to . . . anyone else," (Johnson Aff. ¶ 6, ECF No. 126-1), is belied by the document itself, (Madison Cnty. Immediate Detention Form, ECF No. 106-2), and fails to create a triable issue of fact.[9]

Based on the information that Deputy Ramer gave Officers Thomas and Allen, as well as their own observations of Johnson while monitoring him in the Hospital, Thomas and Allen had reasonable cause to believe that Johnson was a danger to himself or others; therefore, their seizure and detention of him for an 18-hour duration to allow him to undergo a psychiatric evaluation was reasonable.  The Court finds that the officers are entitled to summary judgment on the unlawful-detention claims.

---

[9] The form reads: "The undersigned officer believes the subject above suffers from a psychiatric disorder (mental illness) Unknown . . . Substance Abuse/Addiction Unknow[n] . . . and is a danger to ___ and/or others and in need of immediate hospitalization."  (ECF No. 106-2.)  The place on the form to mark that the subject is a danger to himself was left blank. The natural and reasonable inference from the completion of the form is that Deputy Ramer believed that the Johnson was a danger to others.

5. *ADA Claims*

Because Johnson did not respond to CHA Defendants' arguments regarding why his ADA claims must fail, he has waived any argument that could have been made and his ADA claims are deemed abandoned. *See, e.g.*, *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999); *see also Palmer v. Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003). Therefore, the Court finds that summary judgment should be granted to CHA Defendants on the ADA claims.

## IV.  Dr. Christopher Miller's Motion for Summary Judgment

Johnson alleges that Dr. Miller deprived him of his constitutional rights by ordering the injection of Haldol and Ativan against his will and without his consent for treatment. Johnson also alleges that Dr. Miller ordered Johnson to be medically restrained by use of tranquilizers when he was already physically restrained by mechanical restraints. Dr. Miller moves for summary judgment, first arguing that he was not acting under color of state law and therefore cannot be held liable under § 1983.

In arguing that Dr. Miller acted under color of law, Johnson relies on *West v. Atkins*, 487 U.S. 42 (1988), and *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816 (7th Cir. 2009). In *West*, the Supreme Court held that a physician who is employed by the state to provide medical services to inmates at a state-prison hospital acted "under color of state law" within the meaning of § 1983 when treating an inmate. 487 U.S. at 54. The Court looked to the relationship among the State, which had an obligation to provide adequate medical care to its prison inmates and

delegated that function to the physician; the physician, who assumed the State's obligation by contract; and the prisoner, who was in state custody. *Id.* at 55–56.  In assessing that relationship, the Supreme Court considered: (1) the setting in which the medical care was rendered, (2) the degree to which the professional decisions were controlled or influenced by the state, (3) the contractual relationship between the state and the medical care provider, and (4) the directness of the relationship of the private provider to the prisoner-patient. *Id.* at 55–57 & n.15; *see also Rodriguez,* 577 F.3d at 826–28 (discussing the *West* factors).

Looking to the setting and relationship between the State and Dr. Miller, the medical care was not provided in a prison or other correctional facility but at a private hospital.  Dr. Miller is a privately employed physician and was neither employed by nor under any contractual relationship with the State or state actors when he provided medical treatment and care to Johnson.  While Johnson says CHA was designated by the Sheriff's Department as the facility to take detainees in need of outside medical treatment, (Johnson Aff. ¶ 5, ECF No. 141-1), the record has no evidence that CHA had a contract with the State.  Besides, Johnson was not an arrestee or incarcerated person when the Sheriff's deputies took him to CHA.  Rather, he initially was detained under Indiana's Immediate Detention law because he was believed to be a danger to either himself or others or both.[10]  Further, as a hospital with an emergency department, CHA had a preexisting legal obligation to provide

---

[10] Johnson was not placed under arrest until after Dr. Miller's shift had ended and Miller had ceased providing Johnson medical care.  (*See* Miller Mot. Summ. J., Ex. B, CHA Records at 230, ECF No. 92-2; Miller Aff. ¶ 16, ECF No. 92-1).

appropriate medical screening examination to any individual, like Johnson, who comes into its Emergency Department and on whose behalf a request for medical examination or treatment is made. *See* Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd; *Rodriguez*, 577 F.3d at 827–28. And the evidence is that due to Johnson's violent and erratic behavior, Dr. Miller ordered the Haldol and Ativan injections and mechanical restraints. (Miller Aff. ¶ 13, ECF No. 92-1.) Johnson has no evidence to suggest that the State controlled or influenced Dr. Miller's medical decisions with regard to the injections and restraints or in any other respect concerning his care and treatment of Johnson.

Although Dr. Miller and Johnson had a direct physician-patient relationship for the brief period that Johnson was under Dr. Miller's care, the other *West* factors weigh in favor of concluding that Dr. Miller did not act under color of state law in providing medical care and treatment to Johnson. As in *Spencer*, where "a private physician and a private hospital did not act under color of state law when they committed a mentally disturbed person," 864 F.2d at 1379–81, Miller did not act under color of state law when providing medical treatment and services to Johnson who was under an Immediate Detention Order. Thus, Dr. Miller cannot be held liable under § 1983 for any constitutional violation and he is entitled to summary judgment.

## Conclusion

Defendant Miller's Motion for Summary Judgment, (ECF No. 90), is **denied as superseded by** Defendant Miller's Motion for Summary Judgment, (ECF No. 93), which is **granted**. All claims against Defendant Miller are **dismissed with**

**prejudice**.  Plaintiff Johnson's Motion in Opposition to Defendant Miller's Motion for Summary Judgment, (ECF No. 128), is **denied**.

CHA Defendants' Motion for Summary Judgment, (ECF No. 94), is **denied** as to the excessive-force and failure-to-intervene claims against Officers Phillip Allen and Jason Thomas in Count III, but **granted** as to the unlawful-detention and seizure claim against Allen and Thomas and as to all claims against all other CHA Defendants.  Except for the excessive-force and failure-to-intervene claims against Allen and Thomas, all claims against CHA Defendants are **dismissed with prejudice.**

The Madison County Defendants' Motion for Summary Judgment, (ECF No. 105), is **granted**.  Plaintiff Johnson's Motion in Opposition to Madison County Defendants' Motion for Summary Judgment, (ECF No. 123), is **denied**.  All claims against the Madison County Sheriff's Department, Sheriff Scott C. Mellinger, and Deputy Adam Ramer are **dismissed with prejudice**.

The Clerk is directed to remove all Defendants from the caption except for Officer Allen and Officer Thomas.

The Magistrate Judge is asked to meet with the remaining parties to discuss settlement.  A final pretrial conference and jury trial will be set under separate order.

**SO ORDERED.**

Date: _____3/28/2022_____ 

_[signature]_

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

42

Distribution:

ALFRED E. JOHNSON
1321 McIntosh Lane
Apt D.
Anderson, IN 46013

Distribution by CM/ECF to all registered counsel of record